[Civil No. 1965. Filed October 15, 1923.]

[218 Pac. 986.]

## LEE ARNETT, Appellant, v. H. A. SANDERSON, Appellee.

1. EVIDENCE — NOTWITHSTANDING RECITAL OF WRITTEN CONTRACT TO THE CONTRARY, PAROL EVIDENCE OF FRAUDULENT REPRESENTATIONS, INDUCING EXECUTION, ADMISSIBLE.—Though a written contract contains an acknowledgment that no representations other than contained in it were made, parol evidence of fraudulent representations inducing its execution are admissible; its effect not being to vary the terms of the contract, but to show that what purports to be a contract is void for fraud.

25 Ariz.—28

2. SALES—EVIDENCE OF FRAUD HELD SUFFICIENT FOR JURY.—Evidence in action on a note given as part payment of a jack *held* sufficient to go to the jury on the question of fraud in the sale.

3. BILLS AND NOTES—KNOWLEDGE OF SUSPICIOUS CIRCUMSTANCES ADMISSIBLE TO SHOW BUYER KNEW OF DEFENSE.—Under Civil Code of 1913, paragraph 4201, defining notice of infirmity in note, in an action by the buyer of a note, given by defendant in payment for a worthless jack, evidence that, before plaintiff bought the note, he knew that the payee had previously sold unsatisfactory animals to other persons, was admissible.

4. FRAUD—DETERMINED BY PREPONDERANCE OF EVIDENCE.—While proof of fraud should be clear and convincing, fraud is determined by a preponderance of the evidence.

5. APPEAL AND ERROR—REQUEST NECESSARY TO REQUIRE AMPLIFICATION OF CORRECT INSTRUCTION.—An instruction having correctly required a showing of fraud by a preponderance of evidence, a party to complain of absence of instruction that proof of fraud must be clear and convincing must have requested it.

6. BILLS AND NOTES—BUYER OF NOTE SHOWN TO HAVE ORIGIN IN FRAUD MUST SHOW HE IS HOLDER IN DUE COURSE.—Under Civil Code of 1913, paragraph 4204, when defendant maker has submitted sufficient evidence to justify a finding that its execution was procured by fraud, plaintiff buyer must show that he is a holder in due course, and hence that he took it in good faith and for value.

7. BILLS AND NOTES—WHETHER BUYER OF NOTE HAVING ORIGIN IN FRAUD SHOWED HE WAS A HOLDER IN DUE COURSE, HELD FOR JURY.—Whether plaintiff, buyer of a note shown by defendant maker to have had its origin in fraud, sustained the burden of showing he was a holder in due course, *held* for the jury.

APPEAL from a judgment of the Superior Court of the County of Maricopa. Joseph S. Jenckes, Judge. Affirmed.

Mr. Weldon J. Bailey and Mr. John W. Ray, for Appellant.

Messrs. Ward & Griffith, for Appellee.

---

6. What circumstances are sufficient to put a purchaser of negotiable paper on inquiry, in order to secure rights of a *bona fide* holder, see notes in 29 L. R. A. (N. S.) 351; 44 L. R. A. (N. S.) 395; L. R. A. 1918F, 1148.

See 3 C. J., p. 855; 8 C. J., pp. 984, 1022, 1061; 22 C. J., p. 1215; 27 C. J., p. 62; 35 Cyc. 86.

WINDES, Superior Judge.—This is an action by
the appellant, plaintiff below, designated the "plain-
tiff," against the appellee, defendant below, desig-
nated the "defendant," upon a promissory note dated
January 31, 1918, payable to Ruby and Bowers, and
executed by the defendant. On April 18, 1918, be-
fore maturity of the note, the same was indorsed by
Ruby and Bowers to the plaintiff, Lee Arnett. The
note was given as part of the purchase price for a
certain breeding jack, which Ruby and Bowers sold
to the defendant. The case was tried before a jury,
and resulted in a verdict for the defendant.

The defendant in his answer admits the execution
of the note, but alleges, among other things, that the
plaintiff is not the holder thereof in due course, and
did not take it in good faith and for value. As a
separate defense the defendant sets forth, among
other things, that on the thirty-first day of January,
1918, the defendant entered into a written contract
with said Ruby and Bowers for the purchase of a jack
for the sum of $1,500, for which the defendant gave
his notes, one of which is the note sued on; that the
contract contains certain warranties concerning the
worth of the animal; that in selling the animal to
the defendant Ruby and Bowers made certain false
and fraudulent representations; that prior to the date
the plaintiff took the note, Ruby and Bowers had sold
many animals in Arizona which had proven worth-
less, all of which the plaintiff had knowledge of; and
that the plaintiff knew, or should have known, of these
warranties, and knew, or should have known, that
Ruby and Bowers obtained the note by fraud and mis-
representation.

After the plaintiff had submitted a *prima facie* case,
H. E. Sanderson, brother of the defendant, testified,
in substance, that, acting in behalf of the defendant,
he assisted in purchasing the animal; that in order

to induce the defendant to purchase, Bowers, of Ruby and Bowers, stated to him and to defendant that the animal was a sure foal-getter; that he had had two or three colts and that they were certain of his foal-getting abilities; that he had been broken to stand mares, and that they would have no chance of losing a cent upon the jack; that he would back all of his statements with a written guaranty. This witness further testified that at the time of the purchase the animal was about four years old; that the first season he was bred to fifteen or twenty good mares and they got one colt, even though some of the mares were returned for several breedings; that the second season he bred him to a number of good mares, and got no colts. This witness also testified that the jack was not broken to stand mares, but he had a good deal of trouble with him in this respect.

There was introduced in evidence the written contract of sale, wherein appears the guaranty that if the animal did not get sixty per cent of producing mares that were properly bred and returned for trial at the end of the second week, another animal would be furnished of a similar price and quality upon the delivery of this animal at Davis, California. At the bottom of this contract there is written in what appears to be the following:

"If jack hast to be change at Phoenix, Arizona, or Davis, California."

The defendant, in explaining this written addition, stated that when he looked over the contract he found it did not contain the guaranty that animal was a sure foal-getter, and that Mr. Bowers said he would write this guaranty in, and said he would change the place of delivery of the animal to Phoenix, Arizona, instead of Davis, California, in case it should prove unsatisfactory.

Defendant's testimony corroborated his brother's, H. E. Sanderson. The defendant further testified that he relied upon the representations made, and that when he discovered the jack was not as represented, he wrote Ruby and Bowers asking for an adjustment, and offering to deliver the jack at Phoenix, Arizona; that Ruby and Bowers promised to come out and make the adjustment and never did so.

It also appears that the defendant made some payments of interest on the note, but he testified that he did so believing that the plaintiff was an innocent purchaser in good faith.

The plaintiff testified, by deposition, that he lived in Portland, Oregon; that he had known Mr. Ruby since 1913, who also lived at Portland; that he had purchased about $40,000 worth of Ruby and Bowers' notes. Over the objection of the plaintiff, witnesses W. R. Stevens and W. B. Stevens were permitted to testify substantially that, prior to 1918, W. B. Stevens purchased a stallion from Ruby and Bowers, which proved to be worthless for breeding purposes, and gave notes for the purchase price, and that the notes were assigned to the plaintiff Arnett. W. R. Stevens further testified that in 1917 he went to Oregon to see Ruby and Bowers, and that a man at Ruby's ranch sent him out to see the plaintiff; that he informed the plaintiff that the horse was no good, and that W. B. Stevens' father refused to pay the note, and that Arnett, the plaintiff in this case, advised him that he was acquainted with both Ruby and Bowers. Witness W. B. Stevens was permitted to testify that prior to 1918 he had written Arnett that Ruby and Bowers were crooks; that they had sold a horse to one Hartwick under the representation that he was a sure foal-getter, for which notes were given, and the notes went to plaintiff; that he wrote the plaintiff, and advised him that the Hartwick horse was not satisfactory; and that he knew that the plain-

tiff received his letters from replies he had received thereto; that he wrote the plaintiff he was going to sue Ruby and Bowers, and the plaintiff wrote back, "Don't bring suit against them; they are good men. We are bending every effort that we can to locate you a horse." It also appears from this witness' testimony that breeding animals had been sold by Ruby and Bowers to others prior to 1918, which proved unsatisfactory, for which notes were given and assigned to the plaintiff. At the conclusion of the testimony the plaintiff moved for a directed verdict, which motion was denied.

The plaintiff makes a number of assignments of error, but those which are really essential to the determination of this case are the following:

First. That the court erred in permitting defendant and his brother H. E. Sanderson, to testify concerning the representations of Bowers leading up to the sale of the animal and the execution of the contract.

Second. That the court erred in allowing W. R. Stevens and W. B. Stevens to testify concerning other and independent sales of unsatisfactory animals by Ruby and Bowers, and that the plaintiff knew of such sales prior to the purchase of the note sued on.

Third. That the court erred in not rendering a directed verdict for the plaintiff.

The written contract for the sale of the animal, which was executed by the parties and introduced into evidence, contains the following guaranty:

"Guaranty: If the above-named stallion does not get 60 per cent of the producing mares that are properly bred and returned for a second trial at the end of the third week, in foal, during the breeding season, commencing April 1st and ending August 1st, we agree to furnish another stallion of the same price and quality upon delivery of the above-named stallion in as good and sound condition at the end of the first year as he is at present, to our barns at

Davis, California. If the stallion above named should not be a breeder, or should not be true to pedigree furnished, we agree to furnish another stallion at the same price and quality, upon delivery of the above-named stallion in good and sound condition as at present, in our barns at Davis, California, and in consideration thereof, the undersigned, vendee, hereby waive any and all damages, or right of action for damages created by statute, or otherwise, that they, or either of them, might have, by reason of the failure of said stallion to be a breeder, or true to pedigree. Should the above-named stallion not fulfill this guaranty, we will gladly replace according to the terms of this contract, but will not be liable for any damages or offsets that may be claimed by the vendees, in verbal or written contract or changes made by agents. The undersigned purchasers hereby acknowledge that they have read this contract, and that no representations or guaranties were made to them as an inducement to purchase said stallion, or otherwise, except those contained in this instrument, and it is understood that Ruby and Bowers are not to be held liable upon any guarantee or representation, except those contained in this instrument.''

That parol testimony, generally, cannot be admitted to vary the terms of a written contract is elementary. However, there are a few exceptions to this general rule, and one of them is that parol testimony of misrepresentations, which cause the execution of the contract, is admissible. This is true, even though the written contract contains written guaranties, or recitals to the effect that all agreements between the parties are contained therein, or a provision that no verbal agreements affecting the validity will be recognized. 22 Corpus Juris, pp. 1212, 1216; *Hodgkins* v. *Dunham,* 10 Cal. App. 690, 103 Pac. 351; *Jones* v. *Grieve,* 15 Cal. App. 561, 115 Pac. 333; *Berrendo Irrigated Farms Co.* v. *Jacobs,* 23 N. M. 290, 168 Pac. 483.

*Hodgkins* v. *Dunham* and *Jones* v. *Grieve* are both very similar to the case at bar, and in both of these cases the court said that the fraudulent representations could be proven, "notwithstanding that the contract was in writing, and the representations were not."

In *Berrendo Irrigated Farms Co.* v. *Jacobs,* the contract contained the following provisions:

"No promise, stipulation, or representation not herein contained has been made by the company to the purchaser."

The court, in holding that oral testimony of false misrepresentations was competent, said:

"Where one party to the contract has perpetrated a fraud upon the other, by means of which the latter was induced to enter into the contract, he cannot be precluded from seeking redress by a provision inserted in the contract by the party perpetrating the fraud, designed to shut the mouth of the adverse party as to such fraudulent representations which led up to the making of the contract."

The effect of such testimony is not to vary any of the terms of the contract, but is to show that what purports to be a contract is void because of such fraudulent representations.

This testimony being admissible, there was sufficient evidence to go to the jury on the question of whether the defendant was defrauded in the original transaction. There is testimony that representations of material facts were made; that they were untrue; that they were relied upon by the defendant; that they were made with the intention that they be acted upon; and in acting upon them the defendant was ignorant of their falsity and reasonably believed them to be true.

The next question to determine is whether the trial court erred in admitting the testimony of W. R. Stevens and W. B. Stevens, to the effect that Ruby and

Bowers had previously sold unsatisfactory animals
to other parties, and that the plaintiff knew of such
sales and the circumstances and conditions under
which they were made, prior to the time he purchased
the note in question.

It is contended by the plaintiff that he appears as
a holder of the note in due course, and that this tes-
timony, as well as all the testimony concerning the
fraud in the original transaction is not admissible
against him.  It is also urged that this testimony is
inadmissible, because it had no connection with the
sale to the defendant.  Of course, if the plaintiff is a
holder of this note in due course his contention is well
taken, but whether he is or whether he is not is one
of the essential issues in this case.  We must, there-
fore, determine whether this testimony of W. R. Ste-
vens and W. B. Stevens is competent to prove the bad
faith of the plaintiff in purchasing this note.  Para-
graph 4201 of the Civil Code of Arizona (1913) pro-
vides as follows:

"To constitute notice of an infirmity in the instru-
ment or defect in the title of the person negotiating
the same, the person to whom it is negotiated must
have had actual knowledge of the infirmity or defect,
*or knowledge of such facts that his action in taking
the instrument amounted to bad faith.*"  (Italics by
the court.)

Owing to the fact that it is not only difficult, but
almost impossible, to prove the bad faith of the pur-
chaser of a note by direct evidence, considerable
latitude is allowed by the courts in permitting proof
by circumstantial evidence of "knowledge of such
facts that his action in taking the instrument amounts
to bad faith."  Under this rule, evidence of any sus-
picious circumstance, which tends to show that the
transferee of a note knew that there was a defense
to it, is admissible.  8 Corpus Juris, § 1338, p. 1022;
*Metropolitan Discount Co.* v. *Fondren,* 121 Ark. 250,

180 S. W. 975; *Everding* v. *Toft,* 82 Or. 1, 150 Pac. 757, 160 Pac. 1160; *Link* v. *Jackson,* 158 Mo. App. 63, 139 S. W. 588; *Union Investment Co.* v. *Rosenzweig,* 79 Wash. 112, 139 Pac. 874.

In *Metropolitan Discount Co.* v. *Fondren,* evidence that the plaintiff, indorsee of the note sued on, knew at the time he purchased the note of the questionable business methods of the payee and indorser, and that the indorser was in the habit of selling most of his paper to the plaintiff, was admitted. In passing upon the question the court said:

"The familiarity of plaintiff's manager with the methods pursued by the National Novelty Import Company in conducting its business makes it a question for the jury to determine whether or not the plaintiff company had any intimation that there were defenses against the collection of the commercial paper taken by the National Novelty Import Company for the price of the worthless jewelry which was sold from time to time. In other words, since it appears that the business of the National Novelty Import Company was that of selling worthless jewelry, those concerns, which were familiar with its methods of business, must have known that there were defenses against the paper which it was taking in due course of that business."

The case of *Everding & Farrell* v. *Toft,* was cited and relied upon by the plaintiff. Upon a careful reading of this case, it really supports the contention of the defendant. It is there held that circumstantial matters were evidence of knowledge of such facts that the purchaser's action in taking the instrument amounted to bad faith, and the court, in so holding, used the following language:

"Even though the existence of suspicious circumstances does not necessarily spell bad faith, and negligence is not a synonym for bad faith, and failure to make inquiries does not inevitably create an irresistible force which compels a finding of bad faith, nevertheless since the ultimate inquiry is one of hon-

esty and good faith, it is competent to show the existence of suspicious circumstances, failure to make inquiries and want of prudence, and it then becomes the province of the jury to say whether a person taking with knowledge of those facts is guilty of bad faith.''

The case of *Link* v. *Jackson,* quoted above, is a case where a certain stallion was sold by the defendant, a note given for the purchase price, which note was transferred to the plaintiff, who claimed to be an innocent purchaser for value. Defendant alleged fraud and misrepresentations in securing the note. The court declared the principle of the admissibility of evidence of suspicious circumstances to disprove the good faith of the plaintiff, in the following language:

''According to many authorities, it is ordinarily to be expected that the purchaser will testify in his own behalf that he had no actual notice of the circumstances attending the inception of the note, and the defendant will necessarily have to rely upon circumstances to impeach his title to the note. Hence, while the notice or knowledge of the purchaser in cases of fraud must be actual, it is not essential that the knowledge of plaintiff should be established by direct testimony, but, like any other fact such knowledge, may be established by circumstances and inference [citing authorities]. While neither negligence, nor knowledge of suspicious circumstances, nor failure to inquire into the consideration, will in and of itself be bad faith, such facts, when proven, may be considered by a jury in arriving at the ultimate fact of good or bad faith of the plaintiff.''

The testimony complained of tended to show in substance that, prior to the time the plaintiff purchased the note sued on, Ruby and Bowers had sold other animals to other persons under similar fraudulent representations. Notes were given for the purchase price of these animals; that these notes were transferred to the plaintiff, and plaintiff was advised that Ruby and Bowers were selling animals under false

representations. There is further testimony that plaintiff knew the nature of the business in which Ruby and Bowers were engaged, and had purchased from them about $40,000 worth of notes. It also appears that both the plaintiff and Mr. Ruby live in Portland, Oregon, and the plaintiff never sued Ruby and Bowers, or either of them, as indorsers of any of these notes. Certainly all of these facts are suspicious circumstances which the defendant should be allowed to prove as tending to show that the plaintiff took the note in bad faith, and was not a holder in due course.

Plaintiff also assigns as error the following instructions of the court:

"The court instructs the jury that if you believe and find from the preponderance of the evidence that the note sued on in this case was procured from the defendant by fraud practiced by the payees Ruby and Bowers, upon the defendant Sanderson, then the burden of proof shifts to the plaintiff to show that he took the note before maturity for value, in good faith, and without notice of any defect in the title of Ruby and Bowers."

It is argued that the jury should have been instructed that proof of fraud must be "clear and convincing," and that the jury was not entitled to find fraud by a preponderance of the evidence. It is true that proof of fraud should be clear and convincing, but this does not mean that the clear and convincing proof is not to be by a preponderance of the evidence; in fact, fraud is determined by a preponderance of the evidence. 27 Corpus Juris, § 199, p. 62. Had the plaintiff requested an instruction that the proof must have been clear and convincing, he would be entitled to it, but, not having done so, he cannot ask a reversal of this case because the degree of preponderance was not designated in the instruction.

Plaintiff contends further that the instruction is erroneous, because it places upon the plaintiff the burden of proving good faith in taking the note, in case the jury determined that there was fraud in the original transaction. This is a correct statement of the law. By the former decisions of this court, it has now become well settled that, when sufficient evidence has been submitted by the defendant of fraud in procuring the execution of the note, the burden is then cast upon the plaintiff to prove that he is a holder in due course, and necessarily to prove that he took the instrument in good faith and for value. Paragraph 4204, Civ. Code Ariz. (1913); *Navajo-Apache Bank & Trust Co.* v. *Wakefield,* 20 Ariz. 335, 180 Pac. 529; *Navajo-Apache Bank & Trust Co.* v. *Willis,* 21 Ariz. 610, 193 Pac. 297.

The defendant having submitted sufficient evidence to justify a finding that this note had its origin in fraud, the burden was cast upon the plaintiff to show good faith, and whether he has sustained this burden is a question for the jury, and not for the court: *Everding & Farrell* v. *Toft, supra; Arnd* v. *Aylesworth,* 145 Iowa, 185, 29 L. R. A. (N. S.) 638, 123 N. W. 1000; *Union Investment Co.* v. *Rosenzweig, supra.*

There are a few other errors complained of by the plaintiff, but the ruling of the court upon the questions heretofore discussed makes it unnecessary to separately treat them in this opinion.

After carefully considering the transcript of the testimony, the instructions of the court, and the record in the case, there appears to be no error that would justify a reversal of the judgment in the lower court.

The judgment will be affirmed.

ROSS and LYMAN, JJ., concur.