313 P.2d 382

Edward TOROSIAN, Intervenor-Appellant, and

Rillito Race Track, Inc., a corporation, Garnishee-Appellant,

v.

John J. PAULOS et al., O. J. Farness, Peter Teti, Marjorie B. Ross, and Pioneer Constructors, a corporation, Plaintiffs-Appellees.

Nos. 6181, 6206–6210.

Supreme Court of Arizona.

June 25, 1957.

Lewis, Roca, Scoville & Beauchamp, by Walter Cheifetz, Phoenix, for intervenor.

Scruggs & Rucker, Tucson, for garnishee.

Darnell, Holesapple, McFall & Spaid, Tucson, for John J. Paulos et al.

Mesch, Kemper & Jasper, Tucson, for O. J. Farness.

Darrow & D'Antonio, Tucson, for Peter Teti.

Cole & Barry, Tucson, for Marjorie B. Ross.

Houston & Nihan, and Fickett & Dunipace, Tucson, for Pioneer Constructors.

UDALL, Chief Justice.

Six separate appeals, noted in the above caption, were docketed in this court and consolidated for oral argument. Inasmuch as the matters involved are so closely entwined and interrelated, we have decided to dispose of the issues raised in one opinion.

The litigation that gave rise to these appeals had its genesis in five separate actions brought by the above-named plaintiffs-appellees in the superior court of the State of Arizona in and for the county of Pima, against one Fred A. Dragonette. In each suit the respective plaintiffs obtained money judgments against defendant Drag-

onette for amounts aggregating more than $45,000. The validity of such judgments is nowise questioned and Dragonette is not a party to these appeals.

There being four divisions of the superior court in Pima County, two of the cases against Dragonette were originally assigned to Judge Tullar in Division 3, and each of the judges in the other divisions had one of such cases. In an effort to satisfy their respective judgments each of the five sets of plaintiffs—who were represented by different attorneys—obtained writs of garnishment against Rillito Race Track, Inc., an Arizona corporation, garnishee-appellant. These writs were issued and served on garnishee and the latter filed answers to the writs. Each of the plaintiffs then filed affidavits controverting the answers of the garnishee together with pleadings tendering issue on said answers. The plaintiffs, in substance, claimed that the garnishee was in fact indebted to Fred A. Dragonette (their common judgment debtor) in the sum of $40,000. Garnishee filed replies to the pleadings tendering issue whereby it, in substance, alleged that it was indebted to Omega Loan Company or Fred A. Dragonette in the sum of $40,000 on a promissory note, which note the garnishee was informed and believed had been negotiated to persons who at that time were unknown to the garnishee.

At the time when the garnishment issue in the Paulos et al. case (our number 6210) was about to be set for trial in division 2 before Judge Garrett, intervenor-appellant Edward Torosian appeared by his counsel and, upon stipulation, the court entered an order permitting him to intervene. Torosian then filed a complaint in intervention claiming to be a holder in due course and the present owner of the note in question and demanding judgment against the maker-garnishee on the $40,000 promissory note. Rillito filed an answer to the intervenor's complaint which included a counterclaim for interpleader. By the terms of said answer, the garnishee admitted all of the allegations of intervenor's complaint and prayed that the four sets of plaintiffs, whose suits were then pending in the other divisions, be required to intervene in the Paulos action and present what claims they might have to the $40,000 held by the garnishee. By an amended pleading in the Paulos case the issue was raised that if a transfer of the note in question was made to the intervenor Torosian, it was with the intent to hinder, delay or defraud creditors of Dragonette, and that a fair consideration was not paid for the transfer.

There being common questions of fact for determination, by stipulation of counsel, all five cases (our numbers 6206 to 6210, inclusive) were ordered consolidated for hearing before Honorable Lee Garrett,

308

presiding judge of division 2. The order recited:

"* * * The cases are all consolidated for the purposes of determining the issues only contained in the garnishment matters in each separate case * * * that the court may herein determine all garnishment matters in all consolidated cases, and may further determine the priority of all parties in the various cases consolidated as to the date of priority and the amounts each are entitled to, and so forth."

Thereafter the consolidated garnishment issue came on for trial before Judge Lee Garrett with attorneys for all of the parties participating. Evidence both oral and documentary was presented. The following excerpts from the minutes of July 12, 1955, outline the scope of the hearing as well as the decision of the court, viz.:

"Hearing was had on May 14, 1955, on the question of whether or not the intervenor, Edward Torosian, is a holder in due course of said note; and another hearing was had on June 29, 1955, on the question of whether or not transfer of said note to said intervenor was with the intent to hinder, delay or defraud creditors of defendant, Fred A. Dragonette. The issues raised at both hearings were taken under advisement. Briefs and memoranda were filed by all parties. Therefore,

"It is the Decision of the Court:

"(1) That said note was transferred to the intervenor, Edward Torosian, with intent to hinder, delay or defraud creditors of the defendant, Fred A. Dragonette;

"(2) That said intervenor, Edward Torosian, is not a holder in due course of said note."

Thereafter Judge Garrett, without formal notice to the intervenor, referred four of the cases to their original divisions for the entry of final judgment. He retained the Paulos case and entered written judgment therein in favor of the plaintiff and against the garnishee; this judgment recites the findings previously made in the consolidated garnishment matter. In the four cases reassigned the presiding judge of the particular division, without taking further evidence, entered similar minute order judgments in favor of plaintiffs and against the garnishee. The intervenor's motion for a judgment in the consolidated cause, granting or denying to him the relief prayed for in his complaint in intervention, was never ruled upon by Judge Garrett. Nevertheless the intervenor, Torosian, timely filed a notice of appeal from each of the five judgments that were ultimately entered in the garnishment matters. That appeal is docketed here as cause No. 6181 and the issues raised have been fully briefed by counsel representing the parties.

The garnishee, Rillito Race Track, Inc., had five separate judgments, foreclosing the writs of garnishments theretofore served, entered against it, viz.:

| Plaintiff | Our No. | Superior Court No. | Div. No. | Date of Garnishment | Date of Judgment |
|---|---|---|---|---|---|
| Paulos et al. | 6210 | 43228 | II | Dec. 29, 1954 | July 14, 1955 |
| Teti | 6207 | 43146 | III | Jan. 10, 1955 | July 19, 1955 |
| Ross | 6208 | 45028 | I | Jan. 21, 1955 | July 16, 1955 |
| Pioneer Constructors | 6206 | 45271 | IV | March 8, 1955 | July 22, 1955 |
| Farness | 6209 | 43131 | III | March 9, 1955 | July 15, 1955 |

However, it gave notice of appeal in only the Paulos case (No. 6210, supra). Nevertheless, it caused to be docketed in this court the five separate appeals noted above. Briefs that are practically identical were filed on the same date in each case by Rillito. The substance of its assignments of error are (1) that Judge Garrett, who heard the consolidated garnishment issue, should have disposed of all the matters presented by entering a full and complete final judgment in each of such cases. It is asserted that it was error for Judge Garrett to transfer four of the cases back to the presiding judge in the other divisions for the entry of judgment as such courts would no longer have jurisdiction to do so. (2) The respective courts in entering judgment against garnishee-appellant failed to determine Rillito's ultimate rights as against all of the parties-claimant to the fund.

This last objection is no longer valid for at the oral argument counsel representing garnishee admitted it owed to some one the principal sum of $40,000, plus interest at 6%, and it agreed that it would pay such aggregate amount to whom the court directed. This court then requested counsel for all of the plaintiffs-appellees to agree among themselves, in the event they should prevail on these appeals, as to their respective priority of payment out of the proceeds of the $40,000 note. A stipulation setting forth such priority in accordance with the schedule set forth above, signed by counsel for all of the claimants, is now of record. All the claimants concede that the garnishee's ultimate liability shall not exceed the amount of the note with interest thereon. Inasmuch as the other point raised by the garnishee is also urged by intervenor Torosian, we deem it unnecessary to give further consideration to the contentions advanced by Rillito Race Track, Inc.

From the recitations above made it is apparent that appellants have failed to comply with many of the rules of procedure in presenting these appeals. Numerous objections specifically setting forth such vio-

lations and irregularities have been made by the appellees. In view of the disposition that we have concluded must be made, we have decided to ignore such objections, even though they may be well taken, and to go ahead and determine the basic issues presented by the appeals.

 Principal among intervenor's eleven assignments of error are three which attack the sufficiency of the evidence to sustain Judge Garrett's findings that the note in question was transferred to intervenor with the intent to defraud the creditors of Dragonette and that intervenor Torosian was not a holder in due course. The case was tried to the court sitting without a jury. No citation of authority is required for the proposition that the evidence, with all inferences properly deducible therefrom, is to be taken in a light most favorable to sustaining the judgment or order under review. While there is some conflict in the evidence, we are of the opinion the record contains ample grounds for sustaining the crucial findings of the trial court.

It appears that no useful purpose would be served by extensively setting forth all of the evidence bearing upon these matters; we shall, however, summarize some of the more pertinent facts. The record is replete with evidence that Dragonette, at the time here involved, was in financial distress. That he was unable or unwilling to satisfy his creditors was established in part by showing the numerous lawsuits that had been brought against him, many of them—such as these five garnishment cases—having gone to judgment. Previously he had been the principal owner of the Old Pueblo Savings and Loan Association in Tucson which was sold to James R. Heron. At times Dragonette did business as "Omega Loan", this being a fictitious name employed by him, but he was the owner of all of its assets. Apparently his only tangible asset was the $40,000 note (dated February 4, 1954) which was made payable to Omega Loan by Rillito Race Track, Inc. There is testimony of James R. Heron that Dragonette had told him he was going to transfer his assets because "He was being pursued by creditors and he wanted to protect those assets." Peter Teti testified that Dragonette said, "He * * * had it so fixed that nobody would get a dime, not one of his creditors would get a dime from his money." More particularly, two attorneys, Hymen D. Goldberg and Walter Stevenson—who represented one of Dragonette's creditors—testified that the debtor, when pressed for an assignment of a part of this $40,000 note, said he still had the note and intended to protect it so that no one could get it away from him and, if necessary, he would transfer it to friends of his.

 Intervenor contends the trial court erred in admitting the testimony of these four witnesses concerning the con-

versations with Dragonette referred to above. Plaintiffs admittedly sought thereby to show a plan, scheme or device used by Dragonette to defeat the claims of his creditors. Intervenor argues the court should have sustained his "hearsay objection" to such testimony because it was not established that the conversations took place prior to or at the time of the alleged fraudulent conveyance of the note by Dragonette. However, these assignments of error are without merit for the following rule is clearly applicable:

"On an issue as to the fraudulent character of a sale or conveyance with respect to creditors, statements indicating the existence of a fraudulent intent are competent against declarant, whether made before or after the transfer * * *."

31 C.J.S. Evidence § 338, p. 1110. Also see, Annotation, 83 A.L.R. 1446 at page 1473, and 24 Am.Jur., Fraudulent Conveyances, sec. 224, p. 342. It cannot be denied that the trial court was fully justified in concluding Dragonette intended through devious means to defraud his creditors, but to prove that the intervenor, Torosian, had notice of this purpose presented plaintiffs with a more difficult problem that could only be solved by adducing circumstantial evidence coupled with inferences properly deducible therefrom.

We now review the evidence which the trial court concluded tended to show that intervenor was not a holder in due course, i. e., that he knew or should have known of Dragonette's intent to hinder, delay or defraud his creditors. The scene shifts to Detroit, Michigan. Edward Torosian, intervenor, testified that he was an experienced businessman, president of Ajax Manufacturing Co. for a period of eleven years; that on April 5, 1954, he bought the $40,000 note in question from attorney Joseph W. Louisell of Detroit, acting for an undisclosed principal, for the sum of $32,500, of which $8,000 was then·paid in cash and the balance represented by his note in the sum of $24,500; that he was not acquainted with Fred A. Dragonette and knew nothing of Omega Loan (payee of the note) or Rillito Race Track, Inc., the maker thereof. Torosian admitted that he relied entirely upon Louisell's assurance that the note "was as good as gold" and that he never made any investigation before purchasing same.

To be a holder in due course one must, among other things, purchase an instrument in good faith and without notice of any infirmity in the instrument or defect in the title of the person negotiating it. Sec. 52–139, A.C.A.1939 (the controlling code) [A.R.S. §§ 44–452, 44–453]. Title of one negotiating an instrument is defective when he negotiates it under such circumstances as amount to a fraud (Sec. 52–141 A.C.A.1939 [A.R.S. § 44–455]); one is deemed to have notice of a defect in the

title of the person negotiating it if the transferee has knowledge of such facts that his action in taking the instrument amounts to bad faith. Sec. 52–142, A.C.A.1939 [A.R.S. § 44–456]. Such knowledge on the part of the transferee may be shown by circumstantial evidence, i. e., evidence of suspicious circumstances. Arnett v. Sanderson, 25 Ariz. 433, 441, 218 P. 986, 989. In the latter case we quoted with approval the following excerpt from an Oregon case, Everding & Farrell v. Toft, 82 Or. 1, 150 P. 757, 160 P. 1160, viz.:

" 'Even though the existence of suspicious circumstances does not necessarily spell bad faith, and negligence is not a synonym for bad faith, and failure to make inquiries does not inevitibly create an irresistible force which compels a finding of bad faith, nevertheless, since the ultimate inquiry is one of honesty and good faith, it is competent to show the existence of suspicious circumstances, failure to make inquiries and want of prudence, and it then becomes the province of the jury to say whether a person taking with knowledge of those facts is guilty of bad faith.' " 25 Ariz. at page 442, 218 P. at page 989.

The following discussion in Humbird v. Arnet, 99 Mont. 499, 44 P.2d 756, 761, is also apropos:

"Fraud in cases where it is sought to set aside fraudulent conveyances, and thereby reach assets on behalf of the creditor or other person claiming to be entitled to such assets, is ordinarily indicated and adjudged by the presence of what the law has come to denominate as 'badges of fraud.' They are said to be facts which throw suspicion on a transaction, and which call for an explanation. It has been said that they * * * afford grounds of inference from which the court or jury are authorized to conclude that a transaction surrounded by them is fraudulent. More simply stated, they are the signs or marks of fraud. They do not of themselves or per se constitute fraud, but they are facts having a tenancy to show the existence of fraud, although their value as evidence is relative and not absolute. They are not usually conclusive proof; they are open to explanation. They may be almost conclusive, or they may furnish merely a reasonable inference of fraud, according to the weight to which they may be entitled from their intrinsic character and the special circumstances attending the case. Often a single one of them may establish and stamp a transaction as fraudulent. When, however, several are found in the same transaction, strong, clear evidence will be required to repel the conclusion of fraudulent intent."

It is apparent from an examination of the record in this case that there are many "badges of fraud", e. g.:

1. *The endorsements on the note.* The first endorsement is "Pay to the order of Omega Loans". Then follows an endorsement that has been scratched out, which reads, "Pay to the order of J. R. Heron". Mr. Heron testified that he knew nothing of such an endorsement and had never seen the note. Following this are endorsements which read: "Omega Loans----Fred Dragonette" and "Pay to the order of Bearer... Omega Loans..Fred Dragonette." The scratched out endorsement itself was sufficient to have put Torosian on inquiry.

2. *The consideration was inadequate.* While Torosian testified he paid $32,500 for the $40,000 note, he stated $8,000 was given in cash and the balance by his promissory note for $24,500 payable to his friend and legal advisor Louisell, as attorney and agent. This note was not due until some three months after the due date of the note allegedly purchased by him. At the time of trial his note was long overdue, yet no demand had been made for payment and Torosian was not sure that he would ever have to pay same.

■ That inadequate consideration is a badge of fraud is well established. In re Woods, 2 Cir., 71 F.2d 270, 272.

3. *The transaction was not in the usual course or mode of doing business.* Torosian admits, "I handled this thing different than I would other business dealings." For instance, the evidence shows Louisell did not want to make any disclosure to Torosian concerning the identity of the person for whom he was acting in the sale of the note, and Torosian did not insist that he do so. This reticence should have put Torosian on notice that "all was not well". Furthermore, purportedly the $8,000 was paid in cash to Louisell in a circuitous manner rather than by check. In Maxwell v. Adams, 130 Me. 230, 154 A. 904, 906, the court said:

"Transactions which are legitimate are not ordinarily conducted out of the usual routine of business. When a circuitous course is followed to do that which customarily would be done openly as an ordinary business affair, we are justified in asking for an explanation."

4. *The entire transaction was attended by an atmosphere of secrecy.* Without going into detail, one cannot read this record without being impressed that this was a most unusual transaction and that it was clothed in an atmosphere of secrecy. Certainly many of these incidents indicate a disposition to conceal rather than merely to be cautious in a business sense.

■ Intervenor's position was consistently that of ignorance of any dealings of Dragonette, but as a transferee he could not protect himself by " * * * choosing to remain ignorant of what the necessities

of his case required him to know * * *." Walbrun v. Babbitt, 16 Wall. 577, 83 U.S. 577, 21 L.Ed. 489, 491.

"Intentional ignorance, such as a willful evasion of knowledge of the facts, constitutes bad faith disqualifying the purchaser from becoming a holder in due course." 10 C.J.S. Bills and Notes § 324 b, p. 820.

◼ It having been shown that title in one negotiating the instrument was defective, the burden was upon the holder to prove he or some person under whom he claims acquired the title as a holder in due course. Sec. 52–144, A.C.A.1939 [A.R.S. § 44–459]. Jones v. Jones, 254 Ky. 475, 71 S.W.2d 999, 1004. Torosian failed to sustain that burden. Instead, the enumerated "badges of fraud", when read together, disclose knowledge in him of such facts as would justify a finding that his action in taking the instrument amounted to bad faith. Therefore, the conclusion of the trial court that intervenor was not a holder in due course is adequately supported by the record.

◼ The intervenor assigns as error the refusal of the court to permit him to take the deposition of attorney Joseph W. Louisell on written interrogatories in Detroit on June 27, 1955. Counsel for plaintiffs resisted this application upon the ground that it was not timely made as the hearing as to whether intervenor Torosian was a "holder in due course" of the note had been concluded on May 14, 1955, and the matter was then under advisement. They further urge that intervenor had had his day in court and could have called Louisell to testify in person at such hearing, for it was shown he was in Tucson on that date, having flown there from Detroit on the same plane that brought intervenor. Undoubtedly Louisell could have thrown light on this transaction had Torosian seen fit to call him to testify and to submit to cross-examination. However, the power of the trial court to order that deposition not be taken or that written interrogatories not be submitted is discretionary, and such order will not be set aside except upon a clear showing of abuse of discretion. See Moore's Federal Practice, 2d Ed., Vol. 4, par. 30.06, p. 2027, and par. 33.27, p. 2339. We perceive no such abuse of discretion in this matter as would warrant a reversal.

◼ Intervenor also contends the trial court erred in sustaining objections to the offer in evidence of a purported carbon copy of a $24,500 note given by him to Louisell as partial consideration for the $40,000 note, and to the proffered testimony by intervenor to show this note to be negotiable. The court rejected the proffered exhibit and testimony as to its nature upon the theory that this was not the best evidence and was self serving. The court, however, did permit intervenor to testify that such a note was executed; hence, he

was not handicapped or prejudiced by the rulings now assigned as error. There is no merit to the assignment.

■ Finally we consider the assignment of intervenor that it was error for Judge Garrett—who heard all of the evidence in the cases—to refer four of them back to their original divisions for the entry of judgment by judges who had heard none of the evidence. The contention is made that thereby the purpose of consolidation was defeated in that (1) the aggregate liability of the garnishee's indebtedness on the note was not definitely fixed or limited, nor were the relative priorities established, and (2) that the findings made by Judge Garrett did not encompass all of the issues; hence, intervenor claims, it was impossible for the judges to whom the cases were reassigned to intelligently consider the various motions made after the entry of judgment. As to item No. 1, supra, we point out that intervenor Torosian was not adversely affected by this claimed defect for that is something that would only concern the garnishee, and, we have heretofore shown, this has been completely cured by the admissions of garnishee and the stipulations of the various claimants to the fund. As to point No. 2, supra, we submit that the record conclusively establishes that Judge Garrett did determine the issues submitted to him for decision; hence, when he sent the cases back to the other divisions, there were no issues left to be decided. All that remained for them to do was to order the entry of judgment foreclosing the writs of garnishment. Furthermore, an examination of the minutes of Divisions I, III and IV in cases numbered 6206, 6207, 6208 and 6209, supra, does not disclose that any motions, after judgment, were submitted to or decided by any of the presiding judges in those divisions. All such motions were presented to Judge Garrett in the Paulos case (our No. 6210), this being the case which was assigned to and completely handled in Division II.

■ Rule 42(a) of the Rules of Civil Procedure, 16 A.R.S., provides that the court " * * * may order a joint hearing or trial of *any or all* the matters in issue in the actions, or it may order all the actions consolidated, and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." This was specific authorization for the court to do what was done in the case at bar. We hold that the superior court has the power to order consolidation of actions for limited purposes or for the trial of certain issues only, and that such an order of consolidation does not thereby effect a merger of the cases consolidated. United States v. Bregler, D.C., 3 F.R.D. 378, 379; Greenberg v. Giannini, 2 Cir., 140 F.2d 550, 552, 152 A.L.R. 966; Moore's Federal Practice, 2d Ed., Vol. 5, par. 42.02, p. 1207. The Supreme Court of the United States, in the case of Johnson v. Manhat-

316

tan Ry. Co., 289 U.S. 479, 496, 53 S.Ct. 721, 727, 77 L.Ed. 1331, 1345, stated:

> " * * * Consolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another."

There is no merit to this last assignment.

The judgments of the trial courts in these five cases are affirmed with directions to apportion to the plaintiffs the proceeds arising from the garnishments in accordance with the priorities set forth in their stipulation filed herein.

WINDES, PHELPS, STRUCK-MEYER and LA PRADE, JJ., concurring.